We're ready. Good morning. Good morning, Your Honor. May it please the Court, my name is David Boies, and I represent Plaintiff. I'd like to reserve, with the Court's permission, six minutes for rebuttal. There are four undisputed facts for purposes of this argument. The first is that the Pizarro painting at issue was looted from the Plaintiff's grandmother by the Nazis, that the Plaintiff is the rightful heir, and that if or unless the Foundation has managed to extinguish somehow the Plaintiff's ownership rights, the Plaintiff is the rightful owner. Second, the Plaintiff had no actual knowledge or notice that the painting was in the hands of the Foundation until shortly before the application for its return was made. Both of those facts are genuinely undisputed. The next two facts are undisputed for purposes of this motion because, as the Court below held, they are disputed material issues of fact, or they're disputed issues of fact that would be material if this Court holds they are relevant to the legal issues. Those are, third point, the Foundation acted in bad faith with actual or constructive knowledge that this was a looted piece of art. Fourth, there was no reasonable way the Plaintiff could have discovered the existence of the painting in the possession of the Foundation until shortly before the demand for its return was made. Those four facts, undisputed for purposes of this motion, are relevant to each of the legal issues that this Court faces. Those legal issues are, first, what jurisdiction's law applies to determine this case? Is it California or is it Spain? Second, assuming that Spanish law applies, does Section 1955 of the Civil Code give the Foundation title to this painting because it displayed it in its museum in Spain for six years? That, in turn, assuming that the normal requirements for Section 1955 are met, that, in turn, raises several important legal issues. I'm going to address three. The first is whether Section 1956 of the Civil Code applies. If it does, then it is undisputed that the Foundation did not get title because they didn't hold it long enough. 1956 says that somebody who has been an accessory, an incubator, or a purloiner under Spanish law cannot take advantage of the six-year period. Could I ask you a question about 1956 and the definition of accessory? As I understood it before the District Court, the expert reports and the arguments were looking at the definition of accessory in the 1973 Code. The argument made before the District Court was the Foundation had been engaged in concealing the art for the benefit of the Nazis. That's what the District Court ruled on. Now, before us, the argument has changed. The argument is the definition of accessory should be based on the meaning of accessory in 1870, but I didn't see any Spanish Supreme Court case on point or any legislative history or any expert report that would let me know whether the definition, whether the legislature in enacting Article 1956 meant accessory to mean as it was then existing in 1870 or that the perpetrator had committed a crime as understood at the time of the crime. So could you tell me what Supreme Court case will tell me the answer to that? I will try, although it will be unsatisfactory, Your Honor, because I don't think there is a Spanish Supreme Court case. What we do know, though, is that at the time 1956 was enacted, the only code was the 1870 Code. That is, we know that at the time that 1955 was enacted, the code, the applicable code, was the 1870 Code. I also want to just note, Your Honor, that... which existed in the Spanish Penal Code. The writers of the 1889 Civil Code were different from the persons who wrote the 1870 Penal Code. Do you have some basis that tells us that in statutory interpretation, which I believe is defined in Section 3 of the Spanish Civil Code, we can look at how terms are defined not in the Spanish Civil Code, but in the Spanish Penal Code? Your Honor, I don't think there is something that I can directly point you to. However, the Spanish Civil Code, in enacting 1955, did not define what was meant by these terms. That is, it is true, you're exactly right, that the Penal Code and the Civil Code are different, were done by different people, and it's not a direct one-for-one definition. However, the Civil Code doesn't define it, and so as a next proxy, something to look at in terms of context, we have pointed to the Penal Code. And what tells us that's correct? I mean, in federal law, if this were United States law, we would, the Supreme Court has directed us to look at legislative intent if it's not defined, or use the common meaning of the word at the time. What tells us the approach that the Spanish Supreme Court would adopt? Your Honor, we have only the experts, and the experts are in conflict. I think it is a matter of law for this Court. I think that we don't have a legislative history for 1955 that defines these terms. We don't have a statutory definition. And so we are looking at what is the next best way of thinking about it. And the thing I wanted to just... The next best from whose perspective? I mean, we're supposed to be channeling the Spanish Supreme Court, and so we would want to know what the Spanish Supreme Court says about this type of thing. We would, and I think both sides have said you would look to the Penal Code. They've just looked at a different Penal Code than we have. If they have something that's a better source, they'll tell you, but I know of no better source. There's one thing I do want... I know one of the amicus briefs, I think it was the Comunidad Judia de Madrid, said there was a judgment they cited, 1678-1993, which determined that the two crimes were homogenous when they were talking about Encubador of the recipient of stolen property and being an accessory. Yes, Your Honor, and I want to... There's one thing I just want to clarify from what the Court said before, and that is about the concealment. We also, as the Court has just indicated, emphasized the receipt of stolen property, that that was an additional alternative basis for invoking Civil Code 1956. And in terms of what you're looking at, in terms of receiving stolen property, and I'd refer particularly to ER 243, 254, and 255, what it talks about there is how these two concepts, the stealing and the receiving of stolen property, are homogenous in the sense... But the Court says they have two different mens reas. They said two different intents. One was animus lucrandi, and the other one was animus adjuvandi. I like the Latin better than the Spanish, unlike my colleagues here. And so there are two different mens reas for those two different offenses, and then only one of them under the 1973 Code still makes you responsible for the underlying offense. No, Your Honor, I don't... We would at least disagree with that. I mean, for example, if you look at ER 243, what they're talking about is that it's applicable to the criminal liability under the Code either as accessory of the looting crime of the painting or as author of the reception of stolen goods. So it's not an accessory of the theft, which is what 1956 seems to require. The accessories, those who purloined or stole it, or their accessories. And then in 1973, there's a whole different offense with a different mens rea. It is a lesser mens rea. But with respect to 1956, it is not limited to the underlying crime. In other words, 1956, that's the whole point of what the Court had indicated and what I'm referring you to, is that the whole point of the alternative analysis is that it doesn't have to be an accessory of the original crime. Well, okay, but that... But see, that's... Yes. To me, in my unraveling of this, it would seem to be that the only way that TBC can win on summary judgment is, all right, you get all facts and inferences in your favor. And included in that, you mentioned there are facts that you've developed that have to do with the provenance wasn't properly developed, that in that period, there was the 1958 settlement. There were a lot of things that would give rise to that this could have been a Nazi looted, that you would get that in your favor. But if the law is, after determining everything, if the law is that you have to be an... that an incubador has to be an accessory to the actual looting, then they could win on summary judgment, right? If you also held that accessory did not mean someone who, after the fact... Right. No, what I'm saying, if they had to be an accessory to the looting, if the looting is the taking of the... The foundation was not an accessory to the looting. Right. The looting took place in the 1930s. That's undisputed. The foundation didn't do that. And if that's what the law is, if that was the determination of what the law is on the legal matter on these facts, they would win. Yes, Your Honor. And that's what the district court held, right? It said the, because the concealment accessory... It is, Your Honor. But the district court, in footnote 17, the district court says that we don't claim an independent receipt of stolen goods crime with respect to 1956. That's just wrong as the materials that we've just been talking about indicates. So that was simply an error, Your Honor. In view of my time, though, I'd like to just be sure that I get to the two really critical points. Well, I'll give you, I mean, we've taken some time on questions, but I want to find out first if either of my colleagues have an additional question that they want to... No, but I would be agreeable to giving Mr. Bowie five or ten minutes more. Well, just make those points, and if you make them, how long is it going to take you to make them? I'll certainly make them within five minutes, Your Honor. Okay. Well, if you make them in five minutes, I'll give you a five-minute rebuttal. Okay, Your Honor. First, the Spanish historical heritage law that we've referenced explicitly says, Section 3 explicitly says that if a piece of art is classified under the historical heritage law, it cannot be prescripted under 1955. It also says it can't be transferred out of the country. No. No, that's Section 2. That's Section 2. So the royal decree said the Spanish historical law is applicable to this collection to the extent appropriate, correct? That's what the royal decree said. Yeah, it's been, I don't think there's any doubt under the record below that it is subject to the Spanish historical heritage law. Then it can't be transferred out of the country, is that right? Isn't that what the Spanish historical law says? No. What it says is that it cannot be prescripted. But it also says it may not be transferred, whether with consideration or as a gift or ceded to individuals or commercial entities. Right. And what we have said is we want either the painting or we want damages if it can't be transferred out for that reason. So if it can't be transferred out, then Spain would be able to keep it absent some superseding law that would supersede the Spanish historical law, is that right? Absent something, yes. Why doesn't it supersede this prescriptive language also? It seems to be all of the Ps. No, the prescriptive language in paragraph 3 is absolute. It's absolute. It says it can't be prescriptive. The transfer language is absolute. It is. It can't be transferred. Right. It can't be transferred and the prescriptive period doesn't run again. But if they haven't prescripted it, that is, they don't have title because they can't prescript it under section 3. Nothing says they have to have title in order to have it not be transferable. Yeah. This just says we just declare it of cultural interest and it can't be transferred. And if they, but just first, it can't be prescriptive. They don't have title under section 3. That's clear. Does Spanish historical law not apply? No, it does apply. Well, then it can't be transferred. That says absolutely it can't be transferred. And that provision is something the court will have to decide as a matter of law whether that is applicable. And if it is, then we're entitled to damages even if we can't get the painting. But if I'm, but it's very important, Your Honor, to understand that their whole argument depends on it being prescriptive. If it's not prescriptive, if they hold plaintiff's property improperly, then we are entitled either to the painting or if historical law prevents it from being returned, then we're entitled to the damages. But the European Convention on Human Rights that we refer to in our briefs, that unquestionably, if it's applicable, controls just as the federal constitution would control in California. That would preclude the Spanish government from saying we don't have title, but we're nevertheless going to hold it here. So the argument there, I guess, was the extent of the Pai case. Right. And so there's a disagreement, but we don't have any definitive ruling about how they would rule. Since they said adverse possession didn't violate that rule with respect to real property, so we don't have any information on whether adverse possession would run on personal property. Well, we have the following. In the Pai case, the Pai case itself says that the European Convention on Human Rights is applicable to adverse possession or prescription. And they say whether it precludes it depends on the particular facts of the case. And they lay out the criteria. Okay. And if you look at that criteria, the court decided 10-7 that those criteria in that case did not preclude prescription. But if you apply those same criteria to this case, they would preclude prescription. So there's an argument about that. So there's no per se rule that adverse possession is against the convention. So you're just saying in this case you would apply those principles as not allowing adverse possession here. Am I understanding that right? Yes. For example, in Pai there was no bad faith. There was no theft. It was real property, not movable property. It was, as the trial court in this case held about Pai, it was a control of use of land decision rather than a deprivation of possession decision. In addition, the article of the convention provides that you cannot have prescription if it's in violation of international law. And as we've indicated in our brief, particularly with respect to art looted in the Holocaust under the Terezan Declaration, under the Washington Principles, which Spain has signed on to, those are situations in which international law would require the return of this. So whatever the Spanish interpretation would be, the controlling EU constitutional provision would require the return of this painting. It would preclude prescription under the facts of this case. I'll try to do it in five minutes, Your Honor. All right. Well, I'll give you five minutes for rebuttal. And I recognize him for both sides. I mean, this is a case, obviously, that's, you know, it's got a lot of things going on. And so if the court, you know, I'll make sure that each of you have the time, that as long as we've got questions, that they get answered. Thank you, Your Honor. Thank you. Thank you. So are you going to be making all of the argument? Yes, Your Honor. Thank you, Your Honor. Thaddeus Stauber of Nixon Peabody on behalf of the Thyssen-Bornemisza Collection Foundation. With me at the table is my colleague, Ms. Sarah Andre, on brief. If it may please the court. I'll give you a little extra time, the other five minutes, if you need it. We'll see how it goes. Well, my son was six months old when I started this case, and he's now 12. She's not in college yet. I'm here as long as you need me to be. And all members of this panel have seen this case in one form or fashion or another, whether it be on the initial decision regarding Foreign Sovereign Immunity Act and its application, or the en banc, which was vigorously argued and resulted in a long and I think, you know, a wise opinion that told us, in these particular cases, it's about getting to the merits of the ultimate story. Maybe, I don't want to derail you, I know that you have a lot of things, but sort of the elephant in the room on this, you know, from my perspective, and then we deal with the legal issues. But it would be, I mean, why should we not find at least a triable issue of fact as to whether TBC turned a blind eye to multiple indicators of the painting's suspect provenance? You know, for example, what do we make of the fact that it had a torn label indicating it was in Berlin, combined with the Baron's lack of provenance information from 1939 to 1976? I mean, these are knowledgeable people, and the Nazi looting is something that, you know, I mean, there's kind of a big elephant in the room there. Well, I'm glad you asked that, Your Honor, because it's an elephant that was brought into the room, quite frankly, after Judge Pragerson's panel found that Section 338C3 was not unconstitutional. And plaintiffs at that time, with their prior counsel, had argued that this, in effect, was just a garden variety property claim. And therefore, as a garden variety property claim, it could go forward. So we went back to the court under Judge Walter's guidance, and we conducted full and complete discovery, including expert reports on behalf of the plaintiff, multiple expert reports on behalf of the defendant, including from the author of the Rape of Europa, Lynn Nicholas, Miss Laurie Stein, who serves as the Smithsonian's own expert, Dr. Jonathan Petropoulos down the street here, who served as the plaintiff's expert. And the court had all of those at its disposal. The plaintiffs have sort of asked us to suspend reality, of which in this particular case is, yes, we know and we've all agreed that the painting was lost under tragic circumstances. Through the good provenance work of Miss Stein, we came to learn that despite it not being pled in the complaint, that, in fact, there was 10 years of litigation over this very artwork, and that there was, in the opinion of the Foundation and the Kingdom of Spain, full and fair compensation paid for the loss, a loss that we would acknowledge is very hard to fill. But nonetheless, a loss that was paid by the offending government for the amount requested by the plaintiff at that time. So this is the 1958 settlement. The 1958 settlement. After the 1958 settlement. But she doesn't think the painting exists. She thinks it's destroyed. She thinks it's destroyed. They think it's lost. Nobody's really quite sure where it is at that time. From 1958, and we're very pleased that Mr. Kossir had an opportunity to have his deposition taken. We took his perpetuation deposition. That was presented to the court. So the evidence was heard on what they did or didn't do, which was absolutely nothing between 1958 and 2000 when somebody brought it to his attention. What the evidence also developed was that in 1951, we have a World War II veteran who had fled Germany as a Jewish family in Hugo Perls, who acquires the work. And the evidence also developed that, in fact, he checked whether this was listed as a stolen artwork and could not find it on any list and sold it to Mr. Sidney Schoenberg, Mr. Sidney Brody. Again, a member of the Jewish community. All of these facts, which now are ones that are used, and apparently the foundation is an accessory to the Holocaust many, many years after that. After the work is very briefly owned by Mr. Brody, it is sold in a fair market transaction to Mr. Schoenberg. Again, an upstanding member of the St. Louis Jewish community, who holds it in the public domain, is published in his collection for over 20 years. Thereafter, a French refugee, Mr. Stephen Hahn, acquires the work and sells it to the Baron, who holds it in the published domain in 1976 in a fair market transaction, as the experts did. $275,000. That's fair market? It was fair market at the time, Your Honor. And I've been involved in many of these cases, and that's a very difficult question for us to address. And so, therefore, we had experts on both sides take a look at the question and provide examples of other passaros that sold at similar prices at a similar time in 1976. It's then publicly known to be in the Baron's collection before it goes on public display at the Thyssen-Bornemisza in Madrid. But your experts said it was fair market value. What did their experts say? Their experts said, of course, it was not fair market value. Okay. They're making some, if I recall correctly, they're making some arguments about the gallery would have had a 50% markup or some huge markup, and so it should have been closer to $500,000, something like that. Right. And what that argument fails to take into consideration is, and this was presented and presented to the court, the full transaction documents regarding the acquisition of not just one artwork, not just a couple artworks, but over 700 artworks that were paid for by the Kingdom of Spain's funding of the foundation, creation of the foundation. In addition to that, just as we see here in Los Angeles with the Los Angeles County Museum of Art or the Broad Museum or across in Washington, D.C. at the Smithsonian or at the National Gallery, the government steps up, it creates a building, that's part of the purchase price. It agrees to take on the daily and monthly and yearly obligations of running the foundation and funding the foundation. So if we look in isolation at the purchase price versus the fair market value, that may not quite add up. But if you look at it as totality, and I'd ask us to not forget, the foundation is a nonprofit entity. It acquired the work to bring it into the public domain and to display the artwork. This is not conduct of an individual that is looking to traffic in stolen artwork. But what's important to understand is when we look at the motion for summary judgment that Judge Walters, in a very well-reasoned opinion, worked through, he focused like a laser on the genuine facts which are not in material dispute, which is that, in fact, the painting has been publicly owned by the foundation since 1993, where it's been on public display with the foundation as the owner in Madrid up until 1999. He didn't have to analyze whether they were or were not in good faith, whether they were or were not in bad faith. But that acquisitive prescription vested title in the foundation, something that Judge Pragerson and his panel signaled was coming when they remanded it down and said, records are not fully developed, we might have a due process violation here, because this statute, as it's written, could reach back and unvest the foundation of vested title. If your client can be defined as an incubador under our legal interpretation of what the law is on that, that defeats the prescription, correct? I'm just starting to look at all angles here. This panel is in an admittedly difficult position, because under these Foreign Sovereign Immunity Act cases, it's asked to sit in judgment and determine the application of foreign law. We would submit to you that Judge Walters did a very well-reasoned job of that, particularly if you focus on his footnotes 15 through 17. That Judge Walters bent over backwards to make sure both sides, and even the plaintiff at the last ditch, had another shot at an expert reply brief. So they were given, and everybody, a full and fair opportunity to present the arguments. At the end of the day — Well, let's assume that he's correct that it's Spanish law, okay? I mean, I know that's not what the appellants are contending, California law, but let's assume that it's Spanish law. Then we have to interpret, as we were talking about, what either does – we've got what the – under the 1956 Civil Code, do we read it in the context of 1870 criminal law? Do we – I cited the other – the amicus that talked about the Comunidad de Judeo de Madrid talked about those terms being homogenous. I mean, what is an incubador? Or neither, as Judge Bea was saying. I mean, so what tells us how to interpret the word accessories in Article 1956 in Spanish law? I think that we have to understand that Spanish law is a civil code. Civil code, admittedly, is not one, as with ours, which has a development of body of case law. So you look to the code on its face and read it in its plainest possible interpretation. And an interpretation that the plaintiff would have you have is that a public institution that is funded by the Kingdom of Spain, that acquired artwork 50 years after World War II, that it is an accessory to the Holocaust, that it went and acquired, with a men's raise, stolen artwork? The jury is not here. You don't have to get into your most emotional arguments. Thank you, Your Honor. The fact of the matter is that under Spanish law, under 1956, an incubador, an accessory, cannot get property by prescription. Whether you are the Thyssen-Burnemisza Foundation, or whether you are the most virtue-drenched person in the world, you cannot get prescription if you are an accessory. The question then is, is a person who benefits by holding stolen property an accessory? And there's no question that this property was stolen from the Kasserers. And now you're holding it. If there were no such rule as prescription, you'd have to give the property back. It's stolen. You don't get title by buying it from somebody who's a baron of the Austrian Empire. So let's forget about all this public persona and get back to the question. The question is, under the Spanish law, is the present possessor of the painting, who is benefiting from the possession because they're showing it in the museum and they're charging entrance fees to the museum, right? The museum is the Palacio de Villahermosa, and it's right across from the Palace Hotel. So that's where it is, right? Now, those people, why are they not accessories under the Spanish law? Because under a plain reading of the Spanish law as set forth by the Spanish experts and as well reasoned by Judge Walters, the simple holding of an object that may at one time have been stolen before does not make that party an accessory. Are they benefiting from the possession? They are benefiting from the possession, but the mere benefit of that possession does not make it enough. No, Your Honor. That was enough in 1889, correct? I don't think it was enough, Your Honor. Why? I do not think the mere... What other definition of accessory do you have from 1889 until 1950 or 1973? The only one that's laid out by the Spanish expert that was submitted on behalf of the Foundation, no other. Article 16 of the Penal Code, right? Right. But as we said earlier, we don't look to the Penal Code to define the Civil Code, Your Honor. That may be an issue, right? But is there any other definition of the word encubridor? Nothing other than what's been set forth before you, Your Honor. And I'd like to also point out that in Foreign Sovereign Immunity Act cases, your point is very well made and accepted with respect to we're not arguing to the jury, because in Foreign Sovereign Immunity Act cases, there is no jury trial. It is the court. No, what I meant by jury was... The court is making that decision. You were injecting into your argument emotional terms regarding the... The charge is not at any time that the museum has been an accessory to the Holocaust. The charge is that the museum is an accessory under the Spanish law because it holds a painting which has been stolen. The title has never passed away from the casseroles, and it is holding it for its benefit, and that makes it an accessory under the Spanish law. That's the position of Mr. Buies. I understand, Your Honor. We disagree with that position wholeheartedly, and we think that our expert has laid down a well-reasoned application of the Spanish Civil Code, and that Judge Walters followed that well-reasoned application of the Civil Code. My apologies if I'm making this an emotional case. It is one in which my client has been accused of many different acts, which it has not been responsible for. But I want to come back to the focus of the limited situation we're here before you and the fact that it is undisputed that under Spanish Civil Code, acquisitive prescription facts have been clearly met. There was no evidence presented at the trial court that rebutted any of the direct testimony of the Foundation's director. So the Foundation received stolen property. You're not disputing that, correct? Well, we are disputing that, Your Honor, because our position is that the 1958 settlement agreement ended the status of the property as stolen. We understand you disagree with that. Let's assume that we disagree with that because the Sachs case says, no, the owner still has ownership interest in the property. It was originally stolen. Let's assume that it wasn't cured by the 1958 settlement. And so regardless of how much time has passed, the Foundation received stolen property and is currently holding stolen property. You don't disagree with that? I don't disagree that the Foundation is currently holding property that it was one time stolen. Yes, Your Honor. So when I look at the prescriptive right in Article 1956, the only question I have, I mean, there's lots of questions in this case, but the key one to me is, is for purposes of Article 1956, is the Foundation an accessory? And I don't know where to look or who's going to tell me that. But the argument that's made by appellant is that I should look at the then existing criminal code, which says a receiver of stolen property is an accessory. So why don't you tell me why I shouldn't do that in interpreting this article? Okay. What I would submit is that whatever I would argue or what plaintiff's counsel would argue, where we really need to go to is the Spanish law experts and the Spanish law expert on behalf of the Foundation or the Spanish law expert on behalf of the plaintiff. And take a close examination of those particular two arguments that they laid them out. And I think I would submit that under our straightforward application of it. But we can't look at it as there's a triable issue of the law based on the experts. No, you're not looking. We have to determine what the law is. You have to determine what the law is. So I didn't see, I guess because this was raised for the first time on appeal, I didn't see much in the experts' reports that spoke to this issue in 1956. Everyone seemed to be arguing the definition of what accessory meant in 1973. So tell me what is your best expert report that would tell me, when I look at Article 1956 and the word accessory, what that means? I would like to come back to you on that, on rebuttal, and give you a direct answer on that if you're trying to. All right. Because we've got the cross-appeal here. Yes. So are you? Unless there's other questions that you would like to address. Okay, sure, sure, sure. I know, when there's cross-appeals, I usually let, if people want to, so I'll, I can give you, if you finish up on this, then I'll give you like five minutes on rebuttal for your cross-appeal or whatever. Okay, well, what we wanted to emphasize, Your Honors, was that we heard Judge Pregerson and the panel in this circuit very loud and clear, which was conduct a full and fair trial, don't let procedural hurdles get in the way, examine the evidence. And that's exactly what happened here, particularly in a Foreign Subimmunity Act case, where everything was heard and vetted out. It's really not that complicated a case at the end of the day, because we are relying upon Spanish law. We are, unless the Court here wants to go against precedent and say that we would use some other choice of law analysis that would allow us to take this to another level and step in the shoes and create foreign policy and create a new realm of how we determine what choice of law is. So relying on Spanish law, what's our best authority from the Spanish Supreme Court about what accessory was under 1850? And I'll give you a full answer on that on rebuttal, Your Honor. But it's been presented by the experts, and Spanish is a civil code state, so I would submit you go right back to the civil code where it starts. Okay, is there anything else that you wanted to address at this point? No, Your Honors. Thank you very much. Okay, thank you. Let me try to address exactly what the Court was just talking about in terms of accessory. First, I think it is undisputed that if you look back at the time that 1955 and 1956 were adopted, that accessory included somebody who benefited from the crime. Now, we don't have anything, there's no definition in the civil code. The only place that we have to look is the penal code, and both sides have looked at the penal code. Do you have an expert in the record that says this is how today the Spanish courts would interpret the word accessory in Article 1956? And if so, could you point me to that expert report? Sure. If you look at ER 243 and 254 and 255, those are particular pages of the expert report. And I think that, if you're looking for a single place, we cite a lot of other things in our brief. But those would be the pages that I would ask you to look at. And if you look at page ER 254 and 255, you will see references to Spanish Supreme Court decisions and opinions, in which it's talking about exactly what the Court said earlier in a question to me, about the homogeneity of the crime of stealing and the crime of receiving the stolen property. I don't see how that helps you, because those are clearly two different offenses with different mens reas. And one of them, in 1973, is considered responsible for the underlying crime, and one of them is responsible for a completely different crime. So that doesn't tell me how to interpret the word accessory in Article 1956. Because in 1956, it talks about both purloiner and accessory. I think it's clear. I think if you look at these materials, including what's cited from the Spanish Supreme Court, you'll see that it's clear that if you are receiving stolen property, that avoids prescription. In other words, you cannot get the benefit of prescription if you are either the person who stole it or the person who received the stolen property. Just a case to tell you that. So in 1973, it's clear that receipt of stolen property is not accessory. It's a separate offense. I'm sorry, say that one more time. By 1973, in the 1973 Criminal Code, it's a separate offense. It's not an accessory to theft. So what's the best case that says, notwithstanding that case or statute or whatever we use to interpret, that says, notwithstanding that, prescription doesn't run under 1956 if you receive stolen property, even though you're not an accessory under the current code. Just to be clear, before 1973, the receiving of stolen property and the stealing of the property was combined, and it was separated after 1973. But that didn't change the fact that both of those acts, both of those acts preclude prescription. You're saying that conclusorily, relying on 1956, so you're just assuming the conclusion. No, no, I'm not. What I'm doing is I'm referring you to the Spanish law materials that I cited and to the Spanish Supreme Court opinion. That says prescription doesn't run. This is after 1973. There's a Spanish decision that says prescription doesn't run if you're a receiver of stolen property. Is that on one of these pages you cited to me? If you look at the Spanish Supreme Court decision that is the top of page 255, which is talking about judgment as of July of 1993, it says it's admitted the homogeneity between the participation as an accessory regarding a crime against the property and the crime of receiving.  Not in that Supreme Court, but the expert analysis and the civil code analysis that here does. And can I just bring you back to what I think is really critical here, which is the European Convention on Human Rights, because that is the controlling document. That's like the federal constitution. That controls over any member state's laws. But you don't have any decision on point here. Well, I think the pie decision is on point. It's not exactly on all four squares. You don't have any opinion that's on all fours here, which says. Not on all fours, Your Honor. Now, the 1973 statute, it seemed to me what it was doing was it was trying to make sure that no one got away with anything. It was to clarify and to be more inclusive of behavior than to say that this is what, that we don't want, not to necessarily change the law, but just to make sure that people couldn't make those type of arguments in setting it out. Is that what your argument is here? I think that's exactly right, Your Honor. I mean, sometimes how when our legislator finds out that some people make creative arguments that they had every intention of being included, and so then they state it more clearly so that people don't get away with things they don't want them to get away with. I think that's exactly right, Your Honor. Is there any legislative history that would support that interpretation or any case? We don't have legislative history for these things the way we do in the United States. So we're supposed to guess, is that it? I think it's. We're supposed to guess what Spain would say? I think it's partly from the expert opinions, but also I think that the Spanish Supreme Court, when it talks about the homogeneity, what they're really, I think they are expressing exactly the same point. What does homogeneity mean? We don't use that term in the American legal system. No. But I did read in that a case that it's two different mens reas, so it's different offenses. Yes. I don't know what homogeneity means. We don't use that term. I think what they're talking about is the fact that what they're doing is they are clarifying what had existed to make sure, as the Court indicated, to make sure there isn't any loophole. There isn't any way out of it. You're saying it's the same actus reus, but a different mens rea? Couldn't that be what they're saying? That seems to be what they're saying. I don't see how that helps. I'm not sure that that's what they're saying, Your Honor, but I think the key point of what they're saying is that whether it is receiving stolen property or it is the stealing of that property, that that is something that somebody can't prescribe. You said the word prescribed didn't appear in that case, so they clearly didn't say that. No, but I think that's part of what they're obviously up to. That's what you think they're saying because it's helpful. There wasn't any indication that the 1973 was passed in response to looted property from the Holocaust, right? No, Your Honor. Not that I'm aware of. And I know you're certain reluctance here on the convention, but I think it's really important because the Pye case makes absolutely clear that individual member states can't have prescription rules that will deprive people of a fair opportunity for their property. That's on that case. There is a holding. And if you take the facts as we have them on this argument, which is you have the foundation acting in bad faith, actually publishing false provenance, saying it came from the Paris gallery rather than from the New York gallery, all of the materials that the court cites in footnote five, its opinion, and that we have cited in our brief that indicate the bad faith, the fact that they knew or should have known that this was looted art, included looted art, and they made a policy decision, a, quote, policy decision, close quote, not to do due diligence, even though the lawyers warned them that if some of this was stolen, they might not get it. They disagreed that the family did nothing for some decades. So the painting was on public display. And I understand the argument that, well, it's hard to research or something like that. But the appellee says family did nothing. So they had a fair opportunity, according to appellee. They just didn't exercise due diligence. But that at most is a question of fact, whether they exercised due diligence. You disagree. You say they did do something during that period. No, I know. I don't say that they did something during that period because they thought the painting had been lost or destroyed. But what I do say is that they could not have found this through due diligence. Reasonable due diligence would not have led them to the Spanish Museum or to any one of the foreign books of limited publication. That was not something. It was much easier for the museum, who were experts in this, to have contacted anybody at the Wildenstein Institute, John Rewald, other experts that we've identified in the papers. They had every opportunity. They knew or should have known that this was looted property at the time they took it. And the European Convention on Human Rights, I think is quite clear from the Pai case, does not permit a member state to prescript rights under those circumstances. I have one last question, just really more as a matter of curiosity. You talk about the false provenance that the foundation said it came from the Paris Gallery instead of the New York Gallery. But you didn't explain why that, in the briefs, why that made a difference. Can you explain that? Well, one reason it made a difference is that the New York Gallery was a gallery that had been associated with trafficking in Nazi looted art. A second reason is that the way the provenance was presented, somebody would have concluded that the painting had never left Paris. That is, the provenance that the museum published had it coming from Paris to the museum. Disregarding the fact that it had been looted by the Nazis, smuggled into California, and then transferred in these other situations. So that that false provenance made it look like this was just a normally acquired painting. All right, thank you. Thank you. Unless, do either of my colleagues have any additional questions? All right, thank you for your argument. Thank you, Your Honors. Going back to the question that was at hand regarding the Spanish Civil Code, in 1973, the Spanish legislature broke up the definition of accessory and removed receiver of stolen property from the definition. So in 1999, when the foundation became the owner under requisite of prescription, it could not be defined as an accessory because the definition did not include receiver of stolen property. What the plaintiff is asking you to do is go back to an old definition, way back. Unfortunately, as you pointed out, in 1973, when the Spanish Civil Code was amended and addressed this issue, there was no indication in any of the legislation that it had anything to do with World War II or Holocaust-related claims. The Terrorism Declaration that the plaintiff cites, the Washington Principles that the plaintiff cites are all admirable principles, ones which I have had the good fortune myself to be involved with the preparation of. But as case law has made very clear, they do not create a cause of action, they do not change the application of choice of law rules, and they specifically acknowledge. That doesn't really address my question. My question was what expert report tells me how to interpret the word accessories in Article 1956? I mean, changes in the criminal code are relevant only if your experts say they're relevant. If you look at our brief, pages 65 through 69, we address this issue. Dr. Brube, B-R-U-E-B-A, addressed this issue for us. And what did he say? He said exactly what I have said, which is that when the Spanish legislation changed and broke up the definition, the definition of a receiver from the penal code did not include an accessory. Right. But how does that tell us how to read Article 1956? I understand that the criminal code changed, so that someone after 1973 who receives stolen property is not an accessory, but that doesn't tell me how to read the word accessory in this 1889 statute. Right. Well, in the 1889 statute, you read it as it's plainly set forth. Dr. Brube does address it in that particular brief. Let me ask you a question that came up when Mr. Boyce was back up on when he was talking about the EU. And since we don't have a Spanish Supreme Court case saying exactly what incubador, what accessory meant back in 1870 or whatever, but let's say we did have one that was in your favor. I'm hearing him to say that the EU can trump that by virtue of saying that because as Judge Acuda laid out, this clearly was stolen. It was clearly looted. It clearly was stolen. And if there were a way to say so, but the Spanish Supreme Court says, but you get to keep it because of prescription. But the EU document says you can't keep anything that was stolen by the Nazis and then you can't really pass it. What do you do about that? He seems to be saying it trumps. I don't think he's right. It doesn't trump. I think you have to look at it on a case-by-case analysis. But what I would say what gives us guidance is those countries that have come together to try to create a uniform approach to this and signed on to the Terrorism Declaration, signed on to the Washington Principles and the like, have all said through those guidelines that we recognize this is an issue of great importance. We recognize we'd like to get decisions on the barrens, but we also recognize there's a conflicting principle here that every country has its own laws and property rights. Every country should be able to govern the way property is bought and sold and transferred within its own country. And, therefore, we were going to adopt guiding principles, but we don't have an EU directive that directly addresses this particular issue. That's the same issue we ran into in the von Saar case right here in California when we tried to pass a statute of limitations that reopened claims and was found unconstitutional because that's an area that the federal government, that the executive branch needs to weigh in on foreign policy. So I would humbly submit that there is not a EU directive on this for a reason, and that has been supplanted by the Terrorism Declaration and the Washington Principles. Admirable as they may be, they don't create a cause of action, nor did they change the applicable acquisitive prescription laws in this particular case. Does anyone have any additional questions? No. Do you have anything else you want to say? I had nothing else to add, Your Honor. All right. Thank you very much for your time. Thank you both for your helpful argument in this matter, and this case will be submitted. The court is now in recess. Thank you. All rise.
judges: Callahan, Bea, Ikuta